ALBANY,
January, 1818.

AMORY
v.
M'GREGOR.

AMORY and others *against* M'GREGOR.

Goods shipped, contrary to the non-intercourse law of the *United States*, were forfeited immediately, and the owner's property devested by the act of shipment.

But goods shipped in *Great Britain*, after the declaration of war, were not forfeited by the non-intercourse act, which was virtually repealed by the declaration of war.

Trading with an enemy's country is unlawful, but a citizen or subject of one belligerent may withdraw his property from the country of the other belligerent, provided he does it within a reasonable time after the declaration of war, and does not himself go to the enemy's country, for that purpose.

THIS was an action of *assumpsit*, on a contract for the transportation of goods, on board the ship *Indian Hunter*, from *Liverpool* to *New-Orleans*.

The *Indian Hunter* was an *American* ship, owned by an *American* citizen, residing in *New-York*, and was chartered by the defendant, a citizen of the *United States*, then residing and trading in *Liverpool*. *William Maitland* & Co. of *Liverpool*, (a firm consisting of two persons, both naturalized citizens of the *United States*, one of whom resided in *Liverpool*, the other in *New-York*,) as agents for the plaintiffs, who were citizens of the *United States*, resident in *New-Orleans*, shipped on board the *Indian Hunter*, on account of the plaintiffs, nine trunks and one bale of dry goods, and 127 crates of earthenware, being articles of the produce and manufacture of *Great Britain*, to be carried from *Liverpool* and delivered to the plaintiffs at *New-Orleans*. Previous to the shipment of the goods, war was declared by the *United States* against *Great Britain*; but the fact was not known in *Liverpool* until a day or two after they were shipped, in consequence of which an application was made by the persons interested in the vessel and cargo, for a license from the *British* government, to protect the property from capture by *British* cruizers. A license was granted, and the vessel sailed with it on board, on the 25th of *July*, 1812, for

Where goods were shipped in *Great Britain*, after the declaration of war, to be sent to the *United States*, on account of an *American* citizen, and the agent of the charterer of the ship procured the vessel and cargo to be captured as prize of war by a *British* cruizer, and libelled in the vice admiralty court in *New-Providence*, and the cargo, of which the goods in question were part, were claimed by the agent of the charterer, and various other persons, who, in their petitions, alleged, that if it were transported to the *United States*, it would be forfeited, under the non-intercourse law; it was held, that the goods were lost by the act of the defendant, the charterer of the vessel, who was liable on the bill of lading; the shipment, under the circumstances, not being illegal, as a trade with an enemy, and if the non-intercourse act were still to be deemed in force, there could be no doubt that the forfeiture would be remitted, under the act of congress, of *January* 2d, 1813; but, as the defendant had not acted fraudulently, interest was not allowed to be recovered on the value of the goods.

In an action, for the non-delivery of goods, pursuant to a contract of affreightment, the measure of damages is the value of the goods at the port of destination.

*New-Orleans.* On the 19th of *August,* she was captured by a *British* privateer, and taken into *New-Providence;* but, in consequence of the license, was released by the captors. When about leaving *New-Providence,* to proceed on the voyage, she was arrested by a process issuing out of the court of admiralty, which was obtained upon the petition of *Peter M'Gregor,* who sailed on board the vessel, and represented himself to be the agent of the defendant, and which stated, that in consequence of the release of the ship, the master was about to proceed with the ship and cargo to *New-Orleans,* where they would be seized by the *American* government, and forfeited, as importing her cargo contrary to the laws of the *United States,* then in force, and that the goods would thereby be lost to the owners, or underwriters thereon, who were *British* subjects. The master of the ship, however, put in a claim, and the petition was dismissed.

The *Indian Hunter* was then, at the request of *P. M'Gregor,* and one *Stewart,* who was also on board the ship, when she sailed from *Liverpool,* and was proceeding with her to *New-Orleans,* as the agent and consignee of the defendant, captured by Captain *Ross,* of the *British* public ship *Rhodian,* as prize of war, on their giving a bond to *Ross* for his indemnity. The vessel and cargo were libelled in the vice admiralty court, and an unlivery of the cargo was made, by the order of the court, on the petition of *P. M'Gregor.* Claims were filed by *P. M'Gregor,* and other persons residing in *New-Providence,* for different parts of the cargo; and, among others, one *Miller,* of *New-Providence,* a partner in the firm of *Miller, Craigie* & Co. claimed the goods in question, as the property of *W. Maitland* & Co. but it did not appear that *Miller,* or his partners, had any authority from them, or were in anywise their agents. It was alleged, in the several claims, that if the goods were transported to *New-Orleans,* they would be seized and forfeited, for being imported contrary to the laws of the *United States,* then in force; and in proof of this allegation, the claimants adduced a copy of a circular letter from Mr. *Gallatin,* then secretary of the treasury, to the collectors of the customs of the *United States,* in which he says, " the non-importation act being

still in force, must, in every respect, be carried into effect. It is your duty to seize and libel *British* merchandize, in whatever manner, or by whomsoever it may be brought or sent into the *United States*, with the exception only of property captured, &c. In the cases which, from peculiar circumstances, may be entitled to relief, this can be granted only by a special act of congress, or upon application for a remission of the forfeiture, &c." A decree was pronounced in favour of the claimants, and the goods in question were delivered to *Miller, Craigie* & Co. who sold the same for the nett sum of 1652*l.* 11*s.* 1*d.* sterling, which was remitted, by consent of both parties, to *Maitland* & Co. who now hold the same for whom it may concern, without prejudice to the rights of either party. The jury found a verdict for the plaintiffs, for 23,505 dollars and 2 cents, being the amount of the invoice price of the goods, adding 80 per cent., the profit which they would have sold for at *New-Orleans*, and interest subject to the opinion of the court, who, if they thought the plaintiffs entitled to recover, were to state the principles by which the amount of the recovery was to be ascertained, and judgment was to be entered accordingly.

*D. B. Ogden*, for the plaintiffs. It is admitted, that the defendant was bound by the bill of lading, to deliver the goods of the plaintiffs at *New-Orleans ;* and the question is, whether the plaintiffs are now entitled to recover damages for the non-delivery of them. It will be said, that the voyage was illegal ; but the defendant knew of that illegality, and the court will not, unless compelled by some rigid principle of law, permit such a defence to avail him. By the act of congress, called the non-intercourse act, (*L. U. S.* vol. 9. p. 243, 248. 10th Cong. sess. 2. ch. 91.) all goods imported into the *United States*, contrary to the provisions of that act, are declared to be forfeited; and if goods are put on board of any ship, &c. with intention to import the same into the *United States*, contrary to the true intent and meaning of the act, &c. they are to be forfeited. In order to judge of the *intent*, the court must look into the circumstances of the case. By the act of the 2d of *March*, 1811,

(11th Cong. sess. 2. ch. 96. s. 2.) Congress declared, that in case *Great Britain* should so revoke or modify her edicts, (orders in council,) as to cease to violate the commerce of the *United States*, &c. the non-intercourse act, as regarded *Great Britain*, should cease. Now, before the goods in question were shipped, the orders in council were revoked, and the plaintiffs, with perfect good faith, put the goods on board of the ship, with a well-grounded belief, that the non-intercourse act would cease to operate, before their arrival in the *United States*. They were not put on board with any intent to violate the act of congress.

Again; it will be said, that this was a contract, or trading with the enemy, during war, and, therefore, illegal. But this was an *American* ship, owned by citizens of the *United States*, and the goods were actually laden on board, before any knowledge of war. Both parties to the contract are *American* citizens; and the goods were placed under the flag of the *United States*, before the declaration of war was known in *Liverpool*. It was not, therefore, a trading with an enemy. Besides, an *American* citizen, who happens to be in the country of the enemy, when war intervenes, has a right to withdraw himself, with his effects, within a reasonable time. This right was not denied by the supreme court of the *United States* in the case of the *St. Lawrence*, (9 *Cranch*, 120.) in which this defendant was the claimant. It would be strange, indeed, if this were not the case. Why is it unlawful to trade with an enemy? Because it adds to his resources. Does this reason apply to the case of a person's withdrawing himself, with all his funds, from the enemy's power, as soon as the war is known? Can it be his duty to remain in the enemy's country, with his property, to the end of the war? In the case of the *Thomas Gibbons*, (8 *Cranch*, 424.) the supreme court of the *United States* decided, that a shipment from *Great Britain*, made even after a knowledge of the war, was to be considered as having been made in consequence of the repeal of the orders in council, if made so soon as to afford a reasonable presumption that the knowledge of that repeal would induce a suspension of hostilities on the part of the *United States*.

It may, perhaps, be objected, that the *Indian Hunter* had a *British* license on board. It is, however, nothing more than a permit for *American* citizens to return to their own country, with their property, unmolested. And the President of the *United States*, in his instructions of the 28th of *August*, 1812, to the commanders of our ships of war, directs that such vessels were not to be molested; and the capture of an *American* vessel, sailing from *England*, in *August*, 1812, in consequence of the repeal of the orders in council, contrary to the president's instructions, has been decided to be illegal. (*The Mary*, 8 *Cranch*, 328. S. C. 9 *Cranch*, 126.)

Did, then, any thing occur during the voyage to excuse the non-delivery of the goods pursuant to the contract? As a common carrier, the defendant must be liable for the non-delivery, unless prevented by the act of God, or a public enemy. For a failure or loss arising from any other cause he must be responsible. The defendant could not be justified for placing the property in the hands of the enemy, from a belief, however strong and well founded, that it would be seized as forfeited to the *United States*, on its arrival at *New-Orleans*. If trading with an enemy be illegal, such an act must be equally so. Besides, there was better reason to suppose that if the property should be seized, it would, under the circumstances of the case, be released; and we find, afterwards, that an act of congress was passed, *January* 2, 1813, authorizing the secretary of the treasury to remit all forfeitures and penalties as to property so circumstanced. Whether *M.* and *S.* were the agents of the defendant or not can make no difference; the defendant is answerable for their interference. (*Van Omeron* v. *Dowick*, 2 *Campb.* 42. *Reid* v. *Darby*, 10 *East*, 143. *Id.* 378. *Hunter* v. *Prinsep.*)

As to the measure of damages, we contend it ought to be the value of the goods at *New-Orleans*, or 80 per cent. added to the invoice price.

*J. T. Irving* and *Colden*, contra. 1. There can be no doubt of the intention of congress rigidly to enforce the *non-intercourse acts*. A brief history of those acts is to be found in 2 *Wheaton's Rep.* 277. It was illegal for the par-

ties to enter into any contract in violation of those acts. Where a contract is entered into, the execution of which will violate the laws of the country, such contract is void. If illegal and void in its inception, every subsequent step towards the performance of it must be equally unlawful. All contracts and agreements contrary to statute are void. (1 *Fonbl. Eq.* b. 1. ch. 4. s. 4. n. 9. 1 *Comyn on Cont.* 30. 4 *Dallas*, 269. 298. 308. 342. 1 *Binney's Rep.* 110. *Cowp.* 341. 3 *Term Rep.* 454. 1 *Bos. & Pull.* 551. 5 *Term Rep.* 599. 2 *Lev.* 174. 2 *Hen. Bl.* 379. 2 *Wils.* 133. 1 *P. Wms.* 192.) Whatever may have been the intent of the parties, the bringing the goods into the *United States* was manifestly against law. The president's proclamation was evidence merely that the acts ceased to be in force, and until the proclamation was made, they must continue in full operation. The shipment of the goods, therefore, being illegal, they were, *ipso facto*, forfeited to the *United States*. (*Fontaine* v. *Phœnix Ins. Co.* 11 *Johns. Rep.* 300.)

2. This was a contract between enemies, during war. The plaintiffs were citizens of the *United States* residing at *New-Orleans*, and *M'Gregor* was a naturalized citizen, domiciled at *Liverpool*, and carrying on trade in the enemy's country, and, therefore, to be regarded as an enemy. (3 *Rob. Adm. Rep.* 22, 23. 25. 4 *Rob. Adm. Rep.* 136. *Chitty's L. of N.* 25. 38. 40. 1 *Rob. Adm. Rep.* 102. 8 *Term Rep.* 31. 561. 4 *Rob.* 232.) The moment that war was declared, it was unlawful for the parties to contract, or to proceed in the execution of a contract already made. Contracts made before war are suspended by it, and may be enforced after its termination, but contracts with an enemy during war are absolutely void. After a declaration of war, an *American* citizen cannot withdraw himself, with *his property*, without the permission of his government. That principle applies only to neutrals, and they must withdraw without delay ; otherwise, by a residence in the enemy's country, they will lose their neutral character. (*The Rapid*, 1 *Gallis' Rep.* 295. S. C. affirmed, on appeal. 8 *Cranch*, 155. 200. *Pott* v. *Bell*, 8 *Term Rep.* 599. The *Mary*, *Vischer*, 1 *Gallis.* 620. S. C. on appeal, 8 *Cranch*, 388. 4 *Rob. Adm.* 195. 202. 5 *Rob.* 141. The *Francis*, *Dunham* &

*Randolph*, claimants, 1 *Gallis.* 445.   S. C. affirmed on appeal, 8 *Cranch*, 354.)   In the case of the *Francis*, Story, J. says, " A state of war puts an end to all executory contracts between the citizens of the different countries.   Whatever contract remains *in fieri* is either suspended or dissolved, *flagrante bello ;*" and he puts a case, as a familiar instance, of the contract of charter-party, as being dissolved by the breaking out of war.   In the case of the *Rapid*, the same learned judge lays down the principle, as clear and well-settled, that *all trade* with the enemy, unless with the permission of the sovereign, is interdicted, and subjects the property engaged in it to confiscation.   War puts every individual of the respective governments, as well as the governments themselves, in a state of hostility with each other.'' Again ; having a *British license* is illegal, and having an *American* license cannot neutralize that illegal act; nor does the act of congress, remitting the penalties or forfeitures which had arisen, render that legal which was unlawful in its inception.

3. The capture at *New Providence* was a peril excepted in the bill of lading ; it was a *vis major*, which excused the non-delivery of the goods.

As to the *quantum* of damages, the true measure is the invoice price of the goods. (*Smith* v. *Richardson*, 3 *Caines*, 219.   *Bridge* v. *Austin*, 4 *Mass. Rep.* 115.)

*S. Jones*, jun. in reply.   1. It is said the contract was illegal ; (1) because it was a violation of the non-intercourse act ; and (2) because it was a trading with an enemy, war having intervened.   As it regards the citizens of the *United States*, the non-intercourse act, and the declaration of war, cannot both be enforced at the same time.   The one must be merged in the other.   War dissolves all duties and obligations existing between the two countries and their citizens, who become mutual enemies.   The one is a municipal, the other a public law.   The consequences, also, are very different. ·  By the non-intercourse act, the property seized for a violation of the act is forfeited, *ipso facto*, to the *United States*.   By the law of nations, the property taken, *jure belli*, belongs to the captor.   If the act of congress is deemed

to be in force against *Great Britain*, after the declaration of war, it would produce great inconsistency. In the case of the *Rapid*, *Story*, J. intimated his opinion to be that the non-importation act was swallowed up in the more extensive operations of the law of war. The same opinion was expressed by him in the S. C. of the *United States*, in the case of the *Sally*, *Porter*, (8 *Cranch*, 382.) The circular letter of the secretary of the treasury, it is true, holds out a different opinion ; but the S. C. of the *United States* have established the law. The act remained in force only as to neutrals ; and that, perhaps, was the reason why the president of the *United States* did not issue his proclamation on the subject. At all events, as between *Great Britain* and the *United States*, the act was a dead letter.

The *second* section of the act of the 2d of *March*, 1811, (11th Cong. sess. 3. ch. 96.) declares, that in case *Great Britain* should revoke, or modify her orders in council, &c. the fact should be declared by the proclamation of the president, and the restrictions, &c. of the non-intercourse act should then cease. *Great Britain* having absolutely revoked her orders in council, the non-intercourse act was substantially at an end. All that was wanting was legal evidence of the fact, that is, the president's proclamation. Though the president thought proper to withhold that evidence, yet the state of things produced by the revocation of the orders in council amounted, at least, to a license by government to import from *Great Britain*. In the *Mary* and *Susan*, (1 *Wheat. Rep.* 25. 45.) the S. C. of the *United States* say, " It is well known that the continuance of the laws of non-intercourse were considered as depending on the continuance of the orders in council." In the case of the *Thomas Gibbons*, (8 *Cranch*, 421.) and the *Mary*, *Stafford*,(9 *Cranch*, 126.) the shipping of the goods, in consequence of the revocation of the orders in council, was held to be excusable. The S. C. of the *United States* considered the act of the 2d of *March*, 1811, as tantamount to a license. A stronger case cannot be imagined of a person honestly acting on the faith of government. Indeed, the act of congress, passed *January* 2, 1813, (12th Cong. sess. 2. ch. 149.) remitting the penalties and forfeitures under the non-intercourse act, virtually de-

clares, that importations from *Great Britain,* in consequence of the repeal of the orders in council, and before the war was known to exist, being made on the faith of government, were not wrongfully made, or in violation of law.

2. It is objected, that this contract was a trading with the enemy, and, therefore, unlawful and void. But, we contend that this was not a trading, but a mere withdrawing, by an *American* citizen, with his goods, from the enemy's country. Unless the party has actually traded, or, by delaying his departure, has been guilty of fault, he may lawfully withdraw himself and his property. He cannot, it is true, negotiate with the enemy; but, if he seizes the earliest opportunity to escape with his property, he cannot be considered as violating his duty, or committing an unlawful act. If, by the general law of nations, a citizen of one country, who happens to be in another, on the breaking out of a war, has a reasonable time to withdraw himself, he may, if not prevented by the enemy, take his funds with him. By the act of congress, passed the 6th of July, 1812, after the commencement of the war, (12th Cong. sess. 1 ch. 129. s. 6.) *British* subjects were allowed six months to withdraw their property from the *United States.* In the *Juffrow Catharina,* (5 *Rob.* 144.) Sir *William Scott,* though he asserts the general rule, that there ought to be a license from the government, yet, where the party had ordered goods to be sent from the enemy's country, before the war, which he had no opportunity to countermand, after the war, he ordered the goods to be restored to the claimant. So, in the *Madonna Delle Gracie,* (4 *Rob.* 195.) the special circumstances of the case were deemed a sufficient excuse for not having a license. The cases cited, on the other side, do not apply. In the leading case, (the *Rapid,*) Mr. *Harison,* after the war, went from *Eastport* to an island within the territory of the enemy, to obtain his goods. An involuntary act, though within the letter of the law, is not to be so construed as to subject the party to the penalty of the law. (*Jenks* v. *Hallett,* 1 *Caines' Cases in Error,* 43.) In the present case, there was not only a constructive license, arising from the act of congress, and the revocation of the

orders in council, but an express license, in the President's instructions of the 28th of *August*, 1812.

The whole current of authorities is in favour of the claims of *American* citizens, under such circumstances ; and, on this principle, have the admiralty courts of the *United States* proceeded in the acquittals, in favour of such claims.

As to the objection of the vessel's having a *British* license, we admit, that, for any other purpose than that of returning home with his property, it would be unlawful for an *American* citizen to take it. But where it is merely for his protection on his way home, and not for the purposes of trade, it cannot have the effect to destroy his *American* character. If there could be any doubt of the *intention*, or the *bona fides* of this transaction, that was a question for the jury.

Again ; if the President's instructions permitted the importation into the *United States*, the defendant cannot allege any illegality, as an excuse for the non-delivery of the goods. Whether they would be seized or not, on their arrival in this country, was a question which concerned the plaintiffs only. If the defendant had a right to refuse to proceed to the *United States*, then it was his duty to return back to his port of departure. Instead of doing this, he sells the property in the enemy's port ; and was thus guilty of an act of illegality, the consequences of which he seeks to throw on the plaintiffs. Under the circumstances of the case, it was his duty to have come to the *United States*, and justified his conduct before the tribunals of this country.

THOMPSON, Ch. J. delivered the opinion of the court.

The first question that arises is, whether this shipment was not made contrary to the non-intercourse act, so that the goods were thereby forfeited, and the plaintiff's title gone. If the non-intercourse law was in full force and operation, at the time of the shipment, I do not see why the principles which governed the case of *Fontaine* v. *The Phœnix Insurance Company*, (11 *Johns. Rep.* 293.) would not apply. The forfeiture was incurred by the act of putting the goods on board, with intent to import the same into the

*United States*; and, according to the principle adopted in that case, the owner loses his right to the property, immediately on the commission of the act which produces the forfeiture. There is, however, a distinction between the two cases. Here the circumstances may warrant the conclusion, that the shipment was made, under an impression and belief, that the repeal of the orders in council would terminate the differences between the two nations, and that the non-intercourse act would not be enforced. And the subsequent act of the 2d of *January*, 1813, shows the reasonableness of such opinion, by remitting the forfeiture, in cases where the shipment was made under such belief. But it has been decided, in the supreme court of the *United States*, that the declaration of war virtually repealed and annulled the non-intercourse act, as between us and *Great Britain*. In the case of the *Sally*, (8 *Cranch*, 384.) the court say, the municipal forfeiture, under the non-intercourse act, was absorbed in the more general operation of the law of war. The property of an enemy seems hardly to be within the purview of mere municipal regulations, but is confiscable under the *jus gentium*. If, by the declaration of war, on the 18th of *June*, 1812, the non-intercourse act ceased to be in force, there was nothing making it unlawful for the plaintiffs to import the goods in question, except the existence of the war itself. The question is then presented, as to the right of an *American* citizen, at the breaking out of war, to withdraw his goods from the enemy's country. Whether these goods were liable to *British* capture, is not the question before us. This branch of the defence is placed on the ground, that it was an illegal act, on the part of the plaintiffs, to withdraw these goods; and that, therefore, a court of justice will not enforce any contract, growing out of such illegal conduct. That all *trading* with an enemy is illegal, is a general and well settled rule. The principle is recognised and sanctioned, as well by the common law, as by the maritime codes of all the *European* nations. (8 *Term Rep.* 554.) It is a wise and salutary rule; but it would require the most direct and controling authority, to satisfy my mind, that the mere act of withdrawing goods from the enemy's country, at the breaking out of a war,

comes within the reason or policy of the rule ; and no case <span>ALBANY,</span>
has fallen under my observation, that has pressed the prin- <span>January, 1818.</span>
ciple thus far. Several cases, in the supreme court of the <span>AMORY</span>
the *United States*, have been referred to, as containing that <span>v.</span>
doctrine; but, on examination, they will not be found to <span>M'GREGOR.</span>
support it. The case of the *Rapid*, (8 *Cranch*, 155.) has
been relied on, as one of the strongest. But that case was
essentially different from the present, and decided upon a
very distinct principle. *Harrison*, the claimant, who was
an *American* citizen, had purchased a quantity of *English*
goods, before the declaration of war, and deposited them on
a small island belonging to the *English*, near the line be-
tween the *United States* and *Nova Scotia;* and after the decla-
ration of war, he sent a vessel, licensed and enrolled for the cod
fishery, and brought the goods away, which, on their re-
turn, were captured by an *American* privateer, and con-
demned, in the circuit court of *Massachusetts*, for *trading
with the enemy.* On appeal, this sentence was affirmed.
Judge *Johnson*, in delivering the opinion of the court, ex-
pressly waives giving any opinion upon the point now un-
der consideration, although in very strong and emphatic
language, he interdicts all intercourse with the enemy. In
a state of war, he says, nation is known to nation only by
their armed exterior, each threatening the other with con-
quest or annihilation. The individuals, who compose the
belligerent states, exist, as to each other, in a state of utter
occlusion. In war, every individual of one nation must ac-
knowledge every individual of the other nation as his own
enemy. Trading, says he, does not consist in negociation,
or contract, but the object, policy, and spirit of the rule is,
to cut off all communication, or actual locomotive inter-
course, between individuals of the belligerent states. Con-
tract has no connection with the offence. *Intercourse, in-
consistent with actual hostility,* is the offence against which
the operation of the rule is directed. But, after thus nar-
rowing all intercourse, he says, whether on the breaking
out of a war, the citizen has a right to remove to his own
country, *with his property,* is not the question before the
court. *The claimant had no right to leave the United States,
for the purpose of bringing home his property from an ene-*

*my's country.* This was the point on which the decision turned. So, again, in the case of the *St. Lawrence,* (8 *Cranch,* 434.) the court say they do not mean to decide on the right of an *American* citizen, having funds in *England,* to withdraw them, after a declaration of war, or as to the latitude which he may be allowed in the exercise of such a right, if it exists. That Judge *Story* did not mean to be understood as deciding this question, in the case of the *Rapid,* is evident from what fell from him in the case of the *St. Lawrence,* when again before the court; (9 *Cranch,* 121.) he says, that it is not the intention of the court to express any opinion, as to the right of an *American* citizen, on the breaking out of hostilities, to withdraw his property, purchased before the war, from an enemy's country. Admitting such a right to exist, it should be exercised with due diligence, and within a reasonable time after the knowledge of hostilities.

Thus it will be seen, that this question never has been decided, in the supreme court of the *United States.* And, from the guarded and cautious manner in which that court has reserved itself, upon this particular question, there is reason to conclude, that when it is distinctly presented, it will be considered as not coming within the policy of the rule, that renders all trading or intercourse with the enemy illegal.

In *Hallett & Bowne* v. *Jenks,* (3 *Cranch,* 219.) the question before the court involved the inquiry, as to what circumstances might excuse a trading, without incurring the penalties of the non-intercourse act of 1798. Ch. J. *Marshall,* in delivering the opinion of the court, observes, that even if *an actual and general war* had existed between this country and *France,* and the plaintiff had been driven into a *French* port, a part of his cargo seized, and he had been permitted to sell the residue, and purchase a new cargo, it would not have been deemed *such a traffick* with the enemy, as would vitiate the policy upon such new cargo. According to this opinion, an actual trading with the enemy may, under some circumstances, be deemed lawful. Independent, however, of this general question, the withdrawing of the goods in question, may very fairly be considered as falling

within the principle settled by the supreme court of the United States, in the case of the *Thomas Gibbons*. (8 *Cranch*, 421.) It was there held, that a shipment made, even after a knowledge of the war, may well be deemed to have been made in consequence of the repeal of the orders in council, if made within so early a period, as would leave a reasonable presumption, that the knowledge of that repeal would induce a suspension of hostilities, on the part of the *United States ;* and that congress had acted upon that principle, by the act of the 2d of *January,* 1813, (ch. 149.) and fixed the time, (15 *Sept.* 1812.) before which shipments might be reasonably made, upon the faith of that presumption. The same doctrine is, again, recognised, and more liberally applied, in the case of the *Mary*. (9 *Cranch*, 147.) The shipment, in the case now before the court, was on the 21st of *July*, and before the declaration of war was known in *England.* From this view of the case, and the law applicable to it, we are satisfied, that withdrawing the goods, under such circumstances, could not be considered an illegal act.

The next inquiry is, whether any thing, afterwards, occurred, to exonerate the defendant from responsibility upon the bill of lading ; and we cannot perceive that there has. There can be no doubt, that the admiralty proceedings against the property at *New-Providence,* after the first release, were by the procurement of the agents of the defendant. The case states that the process was procured by *Peter M'Gregor*, who sailed on board the vessel from *Liverpool*, who was the nephew of the defendant, and represented himself as his agent, on the suggestion in his petition, that if the goods were brought into the *United States*, they would be seized as imported contrary to law, and would be lost to the owners and underwriters, who were, as he alleged, *British* subjects. But, upon claim and answer, put in by the master, the petition was dismissed, and the vessel and cargo again liberated ; and the ship being about to sail, she was again stopped by a *British* armed vessel, by the solicitation and procurement of the same *Peter M'Gregor*, and one *William Stewart*, who was on board the ship, and proceeding to *New-Orleans* with her as the agent and consignee of the defendant, they giving the captain of the *British* ship

an indemnity for such seizure. The ship and cargo were then libelled, and claims interposed, by different persons, for different parts of the cargo; and the goods in question were claimed as the property of *Maitland* & Co. The claimants all alleged, that if the goods were transported to *New Orleans*, they would be seized and forfeited, as imported contrary to law; and, in support of such allegation, produced Mr. *Gallatin's* letter of the 26th of *August*, 1812, giving instructions to the collectors on that subject. A decree was then pronounced, ordering the goods to be given up to the claimants, and they were sold, and the proceeds disposed of as has been stated. There is no pretence, that the persons who represented themselves to be the agents of the defendant, and who acted as such, were not so in fact; and if so, he must be answerable for their acts. Nor is it pretended that the goods in question belonged to *Maitland* & Co. All the representation on that subject was a mere cover to get hold of the property, which it was supposed would be seized and forfeited, if sent on to *New Orleans*. The goods have, therefore, been lost by the act of the defendant; for if they had gone on, and the non-intercourse act had been considered in force, there can be no doubt that, under the act of the 2d of *January*, 1813, the forfeiture would have been remitted; for the shipment was made within the time limited by that act, and under circumstances bringing the case expressly within its provisions.

The only remaining question is, as to the rule of damages, by which the amount of the recovery is to be regulated. This, we think, ought to be the nett value of the goods at *New-Orleans*, the port of delivery. That was the rule adopted by this court, in the case of *Watkinson* v. *Laughton*. (8 *Johns. Rep.* 213.)

Whether interest ought to be allowed or not, depends, principally, upon the light in which the defendant's conduct, or that of his agents, is viewed. The jury might have given interest, by way of damages; and the verdict being subject to the opinion of the court, we are substituted in the place of the jury. If there was any fraud, or gross misconduct attending the transaction, interest ought to be al-

lowed. But we are inclined to think the conduct of the defendant's agents ought not to be stamped with so odious a character. They appear to have acted under an impression, that the goods, if sent on to *New-Orleans*, would inevitably have been seized and forfeited, and entirely lost to the owners, and that what they did would promote their interest. So that, upon the whole, we think interest ought not to be allowed. The verdict must, accordingly, be reduced; and the amount of damages liquidated according to the rule thus laid down.

Judgment for the plaintiffs.