Judge Wright
delivered the opinion of the court:
It, was not contended on the trial before the jury, nor is it now insisted, but the water in the Ohio river was so low when the Chesapeake arrived at its mouth, as not to admit of her proeeed *366 ing to Louisville. There was no dispute then, nor is there any now, that the letter in evidence was written by the plaintiffs to the defendant, and received by him at Trinity after the goods were landed there. I therefore take these two facts as a part of this case, though not included in the finding of the jury.
The bill of lading was a contract to carry from New Orleans to Cincinnati, and deliver to the plaintiffs there in good order, with privilege to the carrier in case of low water to reship for Louisville in some other craft, and charge the increased expense of such reshipment to the consignee. The first point presented, it appears to us, is, did the landing of these goods at Trinity in order for their reshipment, put an end to the defendant’s connection with them as carrier under the contract, and convert him into a warehouse keeper and forwarder ? There seems no necessity for inquiring into the custom of the river when goods are transhipped, to land and protect them by temporary warehouses, if none other can be had, until a suitable craft arrive to take the lading up the river. The bill of lading gave the carrier the privilege of forwarding the goods on other craft than that in which they were shipped in one event, and it seems to us the right to land may bo conceded as incident to the shipment without at all affecting the questions before the court. It was but a privilege to the carrier, in the execution of his contract to convoy and deliver, inserted for his own benefit, to secure him the advantage of as great a por362] tion of the freight as ho could earn, and to throw *upon the owner any increase of expense. The relation of carrier continues from the shipment of the goods until their arrival at their destined port and delivery, unless that relation has been interrupted by some act of the owner or consignee. In that possible view of the case the letter alluded to was read in evidence. It is now claimed that that letter constituted the defendant the agent of the plaintiffs, and put an end to his duties as carrier. There is nothing in the case, and there was no evidence on the trial, to show that this letter was received by the defendant before the accident to the goods. If, therefore, the receipt of the letter was admitted to affect what the defendant urges, a state of things is not shown in this case in which the letter can bear upon the injury. The utmost that could be claimed for this letter, if received before the injury, would be to exonerate the carrier from injury while the goods were detained, under the letter, for lower rates of *367 freight. It can not rea.eh back to influence an injnry which the goods received immediately after they were landed, and before the letter was received, or perhaps written. The defendant had these goods, as carrier, when they were injured, and is subject to the law of carriers. “A common carrier warrants the safe delivery of goods in all but the excepted cases of the act of God and public enemies.” 10 Johns. 7. carrier, in taking freight, is bound to use sound and proper hands and machinery for lading and unlading, and the safe handling and removing the goods; and if loss ensue from the failure in any particular the carrier must bear it. Abbott, 259; 1 Wil. 282 ; 1 Doug. 278. The injury in this chase resulted from the want of machinery to remove heavy aticles, or the carelessness, inattention, or want of strength in the hands employed.
It remains, then, only to inquire into the proper rule of damages in the ease. The goods were delivered at Cincinnati in an injured condition. The carrier earned full freight for their transportation. It would seem to he the dictate of natural justice that the person liable for their safe delivery should make good to the owner the injury they sustained while under his care and control. The owner was entitled to the goods at Cincinnati in their perfect state. But for the act of the defendant he would have had them in that condition. The carrier, in case he deliver the goods at the port of delivery, earns, and is entitled to demand full freights, notwithstanding they have been partially injured, and the consignee must look to his *bill of lading for indemnity. In [363 New York the rule is established that the measure of damage is the value of the goods at the port of delivery. 15 Johns. 38; 14 Johns. 171. The Supreme Court of Pennsylvania, upon full examination, held it best to remove from the carrier all temptations to fraud, and that was best done by making him liable for the value of goods lost at the place of delivery, and established that as the rule of damages in such oases, Founded upon authority, general convenience, and good policy. 12 S. & R. 186. These authorities are not shaken by those cited by the defendant. We think this is obviously the rule of law and justice. The jury have returned two valuations looking to this point.
1. The value, adding sixty per cent, to the sterling cost, as the iisual mercantile estimate in Cincinnati, to cover the charges, freight, and insurance from Liverpool.
*368 2. The actual value of the goods in Cincinnati, deducting therefrom the proceeds of the goods, sold in their injured condition.
Which of these furnishes the rule of damages is the question? The first is the usual mode of ascertaining the net cost of such goods in Cincinnati. In the absence of other evidence, that would be taken as the value of the goods. But when the actual value is found, the supposed or presumed value yields. That is the case ■here, the jury have assessed the damages, as predicated on the actual, as well as the supposed value, the actual value measures the real injury, and is the rule of damage.
Judgment for the plaintiff for that sum, with interest.