## FONTAINE *against* THE PHŒNIX INSURANCE COMPANY OF NEW-YORK.

THIS was an action on a policy of insurance on the schooner *Phœnix,* valued at 6,000 dollars, " at and from *New-York* to *St. Bartholomew,* and at and from thence back to *New-York,* with liberty to touch and trade at *Martinique."* The cause was tried before the Chief Justice, at the *New-York* sittings, in *November,* 1813.

A vessel was insured from *New-York* to *St. Bartholomew,* and at and from thence back to *New-York,* with liberty to touch & trade at *Martinique.* The vessel discharged her outward cargo at *Martinique,* and was taking in a return cargo, having 35 hogsheads of molasses on board, when a storm arose which drove her ashore, and so much dam-

The vessel sailed from *New-York,* the 10th *May,* 1811, on the voyage insured, and arrived at *Martinique,* with a cargo of flour, rice, &c. on the 14th *June* following. The cargo was discharged at *St. Pierre,* which is an open roadsted in the island of *Martinique,* as soon as circumstances would permit, and the vessel was taking in a return cargo, and had on board 35 hogsheads of molasses when, on the 7th of *July,* a violent gale of wind arose, by which the vessel was driven against the rocks oppo-

aged her, that on a survey, she was pronounced not capable of being repaired unless at an expense exceeding half her value, and the voyage was abandoned and the vessel sold. It was held, that if the cargo she was taking in at *Martinique* was intended for the *United States,* it was a breach of the non-intercourse law of the *United States,* passed the 1st of *March,* 1809, by which the vessel would be forfeited, and the property be immediately vested in the *United States,* so that the owners would have no insurable interest. The evidence, however, of such intent ought to be satisfactory and conclusive, and it is a fact for a jury to decide. By " return cargo" is meant a cargo for the home-port, unless otherwise explained.

. *It seems,* that the value of a vessel, to be taken, in estimating whether she can be repaired for one half, is not the valuation in the policy, but her value at the place where the accident happened.

Though a *survey* is not conclusive, as to the state of the vessel, yet if honestly made, it is very strong evidence; and if a vessel, after being stranded, should be deemed a wreck, or her situation desperate, it will justify an abandonment, though she should afterwards be got off by others, and repaired for a less sum than was estimated.

site the town; and after beating against them, was driven so high on shore, that when the gale subsided, and the sea became calm, there was only two or three feet water on the outside of her. The *supercargo, master*, and *mate*, whose depositions were read in evidence at the trial, said it would have cost more than the vessel was worth to get her off. The supercargo stated that the harbour master informed the surveyors, that it would cost about twelve hundred dollars to get the vessel off, exclusive of cables and other materials necessary for that purpose; but all the witnesses expressed their opinion, that it would cost more than the vessel was worth to get her off.

On the 8th of *July* the master presented a petition to the governor, for a survey of the vessel and cargo, and an order of survey was accordingly granted on the next day; and on the 11th of *July* a survey was made by the harbour master, two carpenters, and two sea captains. The harbour master and carpenters were of opinion that the vessel ought to be condemned; the ship-masters, at first, doubted, but they all, afterwards, signed the report for her condemnation. The carpenters said they would not undertake to get her off and repair her bottom for less than 2,500 or 2,600 dollars; and they all were of opinion, that it would cost more to get the vessel off and repair her, than she would be worth in the *United States*. The ship-masters were of opinion that it would cost 5,500 dollars completely to refit the vessel, and that she would not be worth, in the *U. States*, more than 4,000 dollars. The surveyors examined the vessel on the side next to the shore, from stem to stern, without wetting their feet. The vessel was sold at auction for 285 dollars, besides her sails and rigging, which were sold separately.

Three other vessels which were driven ashore at the same time, were surveyed, condemned, and sold as wrecks. Attempts were made to get the *Phœnix* off, by floating her with casks and spars, which did not succeed. The person who purchased her at auction, after several fruitless attempts to get her off, sold her to two *American* captains for 500 dollars. They testified that they tried, for several days, various means, with the assistance of 40 or 50 persons, to get her off, without success. They, afterwards, bargained with a person to give him 100 dollars, if he would get her off; and after trying two days, he succeeded by means of a large lighter. Her bottom was repaired by a carpenter for 40 dollars, but not so as to enable her

to carry a cargo. The sails and rigging were purchased for
her, and she arrived at *Salem*, in ballast, but leaked very badly
during the passage. The whole expense of repairs, and bring-
ing the vessel to *Salem*, was about 2,200 dollars, including 112
dollars for seamen's wages. The whole expense of getting off
the vessel was about 500 dollars. After her arrival in *Salem*
she was sold for 2,150 dollars. The purchasers at *St. Pierre*
were of opinion, that she might, with the repairs they put on
her, have gone to *St. Bartholomew*, in ballast; and that after
she was got off, she might have been repaired for 100 dollars,
so as to have carried a cargo to *St. Bartholomew*, and thence
to *New-York*. They purchased her with a view to bring
her home and sell her, as it was not in their power to bring
home a cargo, on account of the non-intercourse law. Sails
and rigging cost three times as much in *St. Pierre* as in the
United States.

The chief justice charged the jury, that if the captain of the
*Phœnix* took in a cargo at *Martinique* for the *United States*, the
vessel was forfeited by the non-intercourse law, and the plaintiff
had no interest in her at the time of the loss. She was en-
gaged in an illicit trade; but she might, however, lawfully take
in a cargo at *Martinique* for *St. Bartholomew;* that the plaintiff's
counsel stated that they were surprised by this objection, and
that possibly they might have shown that the cargo was intended
for *St. Bartholomew*, and if the jury were of that opinion, the
remaining question would be, whether there had been a partial
or total loss. That the vessel was driven ashore by a tempest,
and the surveyor certified that she ought to be sold; that such
certificate was not conclusive, but if made *bona fide* it was strong
evidence. Presuming it to be an honest survey, it stated that
the vessel could not be got off and repaired for half her value;
and if that was so the loss was total, and the insurers liable.
That the value to be taken, in estimating whether she could be
got off and repaired for one half, was not the value specified in
the policy, but the value at *Martinique*, where the injury happened.
It was immaterial whether she was, in fact, got off for 100 dol-
lars, or for nothing. The case, at the time of the survey, ap-
peared desperate, and the good fortune of the subsequent pur-
chasers could not destroy the right of the plaintiff. That there
appeared to be good cause for the certificate of the surveyors,
and if the transaction was honest, and a sound discretion was

ALBANY,   exercised in selling the vessel, the defendants were liable for a
August, 1814.  total loss, and he was inclined to that opinion; but if the jury
FONTAINE   thought the vessel was not injured to half her value, they must
v.         find a verdict for a partial loss, or the amount of actual damage
PHŒNIXINS.CO.  sustained.

The jury found a verdict for the plaintiff for a total loss.    A
motion was made to set aside the verdict, and for a new trial.

*T. A. Emmet*, for the defendants.    1. At the time of the loss
the plaintiff had not an insurable interest in the vessel, she having
become forfeited to the *United States* for a violation of the non-
intercourse law.    There was no illegality in the voyage insured;
but as actually carried on, it was illegal, and a breach of the law of

\* 10 *Cong. sess.*  the *United States*.    By the act\* it is declared to be unlawful to
2. *c.* 91. *s.* 4, 5,
6. *vol.* 9. *Laws,*  import into the *United States* any goods, wares, or merchandise
243.        whatever, from any port or place situated in *Great Britain* or
*France,* or in any of their colonies or dependencies; and the
goods as well as the ships or vessels on board of which they
are laden are declared to be forfeited.

Where, by statute, a forfeiture of goods is created, the pro-
perty, by the forfeiture, is devested out of the owner, without
any proceeding on the part of the state, and becomes vested in

† *Co. Lit.* 128.  the government.†
12  *Mod.*   92.
*Salk.*  223.   5    This principle was recognised by the supreme court of the
*Mod.*   195.
*Comb.*S. C.361.  *United States* in the case of the *United States* v. *Grundy and ano-*
*Wilkins* v. *Des-*  *ther.*‡    The lading on board, therefore, of the 35 hogsheads of
*pard,* 5 Term
*Rep.* 112.  molasses at *Martinique,* before the accident, with intent to bring
‡ 3 *Cranch Rep.*
337. *and note,*  them to the *United States,* was an act of forfeiture.    All the
356.  the opi-
nion of *Win-*  witnesses agreed that after discharging her outward cargo, she
*chester,* J.  proceeded to take in her *return cargo,* that is, a cargo home to
the *United States*.    It can make no difference, in relation to
the operation and effect of the law of the *United States,* whe-
ther the cargo was to be imported into the *United States*
direct from *Martinique,* or circuitously, by the way of *St. Bar-*
*tholomew.*

It is stated in the case, that the plaintiff's counsel were sur-
prised by this objection at the trial, and the judge in his charge
so states it, and that the plaintiff might *possibly* have proved
that the goods taken on board were intended to be delivered
at *St. Bartholomew;* and on this bare hypothesis, without any
proof whatever, his honour left it to the jury to find that fact,

ALBANY,
August, 1814.

FONTAINE
v.
PHŒNIX INS. CO.

if they believed it. But the act of congress says, putting the goods on board, with intent to bring them into the *United States*, forfeits both vessel and cargo. There should have been some evidence of an intention to deliver the cargo at *St. Bartholomew*. But if it was intended to go to *St. Bartholomew*, merely as a more secure mode of conveying the property, circuitously, to the *United States*, it would not vary the case. It must be shown that it was intended to land the goods at *St. Bartholomew*, and to sell them there, and not to reship them to the *United States*.

2. There was not such a technical total loss in this case as would justify an abandonment. The circumstances excite a strong suspicion that advantage was taken of the accident, to make the insurers pay for the vessel, rather than expose her to seizure by bringing her back to the *United States*. The hull only of the vessel was injured by striking on the beach, which was caused by the violent swelling of the sea. Not a spar, nor any part of her rigging, was damaged. The expense of getting the vessel off, was estimated by the harbour-master at about 1,200 dollars; the actual expense of all the unsuccessful efforts for that purpose was 500 dollars, and an offer was finally made to get her off for 100 dollars, which succeeded.

The right to abandon must be grounded on the *fact* that it would cost more than half the value of the vessel to repair her, not on the *opinion* of men. Opinion, at most, is but evidence of the fact; yet the judge charged the jury that it appeared to be a desperate case.

The survey is very loose and unsatisfactory. It contains no estimate of the cost of repairs; the nature and extent of the damage are not stated. There are no facts on which we can reason, or form a correct opinion. The surveyors merely gave their own broad opinion, without stating facts, by which we might test the accuracy of their judgment. If the estimates of the witnesses, and the actual expenses, as mentioned by them, are examined, the whole amount of the cost of getting the vessel off and repairing her, cannot be made to amount to more than 1,200 dollars. Then, taking the valuation of the vessel in the policy, which I contend is the true mode, it is not possible, by any process of calculation, to make out a case for abandonment. The valuation in the policy is 6,000 dollars;

ALBANY,
August, 1814.

FONTAINE
v.
PHŒNIX Ins. Co.
* 2 Caines'
Cases, 153. 157.

But it may be said, we must take the value of the vessel at the place where the accident happened. In an *open* policy, the valuation is to be taken at the *home* port. In a valued policy, the valuation agreed on must be taken. In *Smith* v. *Bell and others*,* *Lansing*, Ch. J. says, " The difficulty is much increased by the estimate necessarily required of the value of the old (materials) at the *home* port, and of the new at the port of repair." He seems to take it for granted, that the rule is, except in regard to new materials, that the value at the *home* port is to be taken. The object is to bring the vessel home, and her value here is the proper measure. She may have twenty different valuations in as many foreign ports. It might be that the vessel would be worth 20,000 dollars at *Martinique*, and then there could be no case for abandonment.

*Colden*, contra. 1. If the plaintiff had an interest which he could transfer, then he had an insurable interest. It was held, in the case of the *Anthony Mangin*,† that though, as between the party guilty of the breach of the law, and the government, the forfeiture related back so as to devest the individual, and vest the government with the property, yet that the rule did not apply to a *bona fide* purchaser. By the abandonment, in this case, the property was transferred to the insurers, who would, as *bona fide* purchasers, hold her against the *United States*.

But we deny the fact of an illegal trading. The witnesses speak of the lading of a return cargo, as distinguished from the cargo carried out. They do not say it was a return cargo to *New-York*, or to the *United States*.

Stranding, followed by shipwreck, justifies an abandonment, without regard to expenses of salvage or repairs.* Here the vessel was driven on shore, and beat over a ledge of rocks, where she remained high and dry. Various experiments were made to get her off, without success, when it was concluded to abandon any further attempt. Is not this a clear case of shipwreck ?

Again, the vessel having been regularly surveyed and condemned, as incapable of being repaired for less than half her value, there was just cause for an abandonment of the voyage. Subsequent events cannot affect the plaintiff's right to recover. The rule as to half the value, is taken from the *French* law. There, the *freight* enters into the valuation of the vessel, in the

policy, and to this is added the outfits and premium; all which may far exceed the value of the vessel itself. The value in the policy may be, and often is, much too high.

In regard to the *cargo*, the value in the policy does not govern. In order to ascertain the degree of damage to the cargo, the sound and the damaged articles are sold. The policy is regarded as open for this purpose. In the case of *Smith* v. *Bell* it does not appear whether it was a valued policy or not.

It is the valuation at the port of necessity that must be taken as the ground of estimate, and the charge of the judge, in that respect, was correct.

*Emmet*, in reply, said if the underwriters in this case were to be considered as purchasers, they were not *bona fide* purchasers, for they had notice of all the facts, and must have known the illegality of the shipment.

It is true, that stranding, followed by shipwreck, is a ground for an abandonment; but what is shipwreck?(a) It is such an injury to a ship as incapacitates her from proceeding on the voyage, unless repaired at an expense exceeding half her value.* * *Marsh.* 488.

YATES, J. delivered the opinion of the court. The first question presented in this cause is, whether the plaintiff, at the time of the loss, had an insurable interest in her.

By the 4th section of the act to interdict the commercial intercourse between the *United States* and *Great Britain* and *France*, and their dependencies, and for other purposes, passed the 1st of *March*, 1809, the importation of any goods, wares, and merchandises whatever, from *Great Britain* or *Ireland*, or any of the colonies or dependencies of *Great Britain*, is prohibited; and the 6th section of the same law declares, that if any article or articles, the importation of which is prohibited by that act, shall, after the 20th of *May*, be put on board of any ship or vessel, boat, raft, or carriage, with intention to import the same into the *United States*, or the territories thereof, contrary to the true intent and meaning of the act, and with the knowledge of the owner or master of such ship or vessel, boat, raft,

(a) *Emerigon* (*Tom.* 1. 400.) says, there are two kinds of *shipwreck*; one where the vessel is sunk, without any vestige of her remaining above the surface of the water; the other, where the vessel is stranded, and such an opening is made, that her hold is filled with water, without her wholly disappearing.

ALBANY,
August, 1814.

FONTAINE
v.
PHŒNIX INS. Co.

or carriage, such ship or vessel, boat, raft, or carriage, shall be forfeited, &c.

If the master of this vessel intended the lading she had taken in at *St. Pierre*, on the 7th of *July*, 1811, for the port of *New-York*, it would, unquestionably, be a direct violation of the statute, and a forfeiture must ensue, by which the property of the vessel would immediately vest in the *United States*.

In the case of *Wilkins and others* v. *Despard*, (5 *Term Rep.* 112.) it is decided that if a ship be seized as forfeited under the navigation act, the owner cannot maintain trespass against the party seizing, although the latter does not proceed to condemnation, for by the forfeiture the property is devested out of the owner.

The case of the *United States* v. *Grundy and another*, (3 *Cranch's Rep.* 337.) cited by the plaintiff's counsel, rather supports this doctrine. At all events, I cannot find in the report of the case any thing opposed to it. It is there decided, that under the act of congress, of *December*, 1792, which declares that if a false oath be taken, in order to procure a register for a vessel, *the vessel or its value* shall be forfeited ; that the *United States* had an election to proceed against the vessel as forfeited, or against the person who took the false oath, for its value ; and that until the election was made, the property of the vessel did not vest in the *United States ;* that an action could not be maintained for money had and received against the assignees of the person who took the oath, and who had become a bankrupt, the assignees having sold the vessel, and received the purchase money before seizure.

The act of 1792 gives two remedies, the forfeiture of the vessel, or the value, to be recovered from the person who took the false oath; consequently, the remedy is at the election of the *United States*. The property, therefore, could not vest until the seizure. The act, in relation to the case before us, affords but one remedy, and that is, the forfeiture of the vessel, so that the seizure is not necessary to change the property; the owner loses his right to it immediately after the commission of the act producing the forfeiture. It must be granted, that the evidence in support of such an allegation ought to be conclusive, as the effect of it goes to destroy the right of action altogether, for by the forfeiture of the vessel to the *United States*, the insurable interest of the plaintiff was at an end.

The testimony of the supercargo in the case before us is, that the vessel had proceeded to take on board a *return cargo*, and continued so to do until the 7th of *July*, when the gale commenced. In this the captain and the mate concur; and they also state that she actually had thirty-five casks of molasses on board at the time of the disaster; no further explanation of their intentions, as to the disposition of the return cargo, is given.

ALBANY,
August, 1814.

FONTAINE
v.
PHŒNIX INS. CO.

It will not admit of a moment's doubt, that by *return cargo*, the goods for the home port were intended; and if the policy had been confined to one foreign port, no room would be left for any other explanation on the subject; but the vessel was destined for *St. Bartholomew*, with liberty to touch and trade at *Martinique*, the place where those articles were taken on board; it is, therefore, possible that an explanation might be given that the return cargo was intended for *St. Bartholomew*. No such explanation, however, appears in the case before us. It was left to the jury by the judge, without any further evidence, accompanied with an observation, that the plaintiff's counsel stated that he was surprised by the objection taken on the part of the defendants, and that, possibly, if he had not been, he might have shown that the cargo was intended for *St. Bartholomew*. This was not shown, and without it the jury had no ground to infer that it could be so intended, for until explained, the evidence will admit of no interpretation other than that the goods so laden were intended for the port of *New-York*. Although, on the other points, I am inclined to think the cause is with the plaintiffs, yet the objection made by the defendants' counsel, on the ground of forfeiture, being insurmountable, it cannot change the result; a new trial must, therefore, be granted, with costs to abide the event.

New trial granted.