## Case No. 2,832.

CLARK et al. v. PROTECTION INS. CO.

[1 Story, 109.] [1]

Circuit Court, D. Massachusetts. May Term, 1840.

INSURANCE ON SMUGGLED PROPERTY—DIVISIBILITY OF POLICY—FORFEITURE—PENALTY.

1. A policy of insurance is not divisible, so as to be good in part and bad in part. If, at its inception, it is founded in any illegality, in which one only of the owners participated, it is utterly void as to all.

[Cited in Blandy v. Griffith, Case No. 1,530.]

2. Where a ship was insured on a voyage to Liverpool, and took on board in the port of New Orleans a chain cable, smuggled by another vessel, and was lost upon the voyage to Liverpool, by the perils of the seas, it was *held*, that she was not subjected to a forfeiture in rem, but that the master was personally liable to the pecuniary penalties prescribed by law therefor, and that the underwriters were liable for a total loss on the policy. *Held*, also, that the insurance on the chain cable was good; the title being in the owner of the vessel, and the illegality not attaching to the voyage, on which it was used.

3. When property is forfeited, it does not vest in the government until after a seizure, which then relates back to the time of the forfeiture.

4. The 27th and 28th sections of the duty collection act of 1799, c. 128 [1 Story's Laws, 597; 1 Stat. 648, c. 22], are not applicable to such a case as this; but it is covered by the 50th and 59th sections of the act, which provide a penalty for unlading goods without a special permit or license from the collector, or for knowingly receiving or concealing goods, liable to seizure. But the vessel receiving smuggled goods is not liable to forfeiture.

[Cited in U. S. v. Distilled Spirits, 14 Wall. (81 U. S.) 61.]

5. Every statute, imposing a penalty, imports a prohibition, and makes the prohibited act illegal.

[Cited in Hatch v. Burroughs, Case No. 6,203.]

6. A mere intention to do any act, which would avoid a policy, if done, but which has never been consummated, does not vitiate the policy. The voyage, to avoid the policy, should be originally either wholly or in part illegal as to trade and objects.

7. If a voyage as originally insured be valid, any subsequent illegality in the course of the voyage will not affect the policy, so far as concerns losses on property not tainted with such illegality, though connected with the res gestae.

8. If the illegal act is followed by a forfeiture and seizure of the thing insured, the underwriters are not liable for the loss. But the mere liability to forfeiture, does not avoid the insurance, or prevent a recovery for a loss by any independent peril.

At law. Assumpsit on a policy of insurance underwritten by the Protection Insurance Company, on the 10th of November, 1837, whereby they insured the plaintiffs, "Means & [Joseph] Clark, for whom it concerns, payment to them to be insured, lost or not lost, twenty thousand dollars on the ship Avon, at sea and in port, for and during the term of one year from the 12th day of November, 1837, at noon; and if at sea at the expiration of said term, the risk to continue until her arrival at the port of destination, at a pro rata premium." The vessel was valued at $28,000, and the premium was four per cent. per annum. The policy in other respects was in the common form of the Boston policies.

The parties agreed upon the following statement of facts: The defendants, on the 10th of November, 1837, made a policy of insurance, whereby they insured Means & Clark, for whom it might concern, in the sum of twenty thousand dollars on the ship Avon, valued at $28,000, for one year. The vessel was owned by Joseph Clark, James R. Groton, George Sproul, Arthur Child, who was master, and Thomas Johnson, all of Waldoborough, in the state of Maine, and the plaintiffs, and the policy was made for them and by their orders. She sailed from Waldoborough, Maine, on her first voyage, in November, 1837, for New Orleans, arrived there in December, thence went to Natchez, and sailed thence for Liverpool, about February 1st, 1838, and was totally lost by the perils of the seas on her passage. When she sailed from Waldoborough, she had on board, besides her stream cable, one hempen and one iron cable. The master was employed for the owners to obtain the rigging and part of the equipments of the ship, and it was his intention to change the hempen cable for the iron one hereinafter mentioned. At New Orleans, the hempen cable was taken out, and an iron one substituted, of the value of more than $400, which was purchased, and put on board in the following manner:—In September, 1837, the said Arthur Child requested his brother, Samuel, then about to sail for Pictou, in the province of Nova Scotia, to purchase an iron cable there for said vessel. The cable was bought there, shipped on board of a vessel belonging to citizens of the United States, concealed under a cargo of coal, thence carried to the port of New York, not entered or landed there with the rest of the cargo, but concealed on board, and thence carried in the same vessel to New Orleans, and there secretly taken out, without any license or authority of any officer of the customs, and put aboard the Avon at night, long after sunset, and kept there concealed, while the Avon remained in the United States; the object being to evade the payment of the duties, to which such

[1] [Reported by William W. Story, Esq.]

cable was liable on importation into the United States. There is no evidence, that any of the plaintiffs except the said Arthur Child were privy to, or had any knowledge of these doings or of his intentions. The Avon without the hempen cable, or the iron cable substituted for it, was unseaworthy. The insurance company, in ignorance of these facts, on June 25th, 1838, paid Means & Clark, on account of said loss, the sum of ——; but, on coming to a knowledge of these circumstances, conceive themselves not to be liable at all, and claim to recover back the amount paid. The case is submitted to the court on the above statement of facts. If the court shall be of opinion, that the plaintiffs are entitled to recover, judgment is to be rendered for $3995.54, with interest from May 11th, 1840, and costs, and otherwise the defendants to have judgment for costs.

F. C. Loring, for plaintiffs.

The facts admitted show a prima facie case for the plaintiffs. The defence consists in one single fact, that the ship insured had on board a cable, which, having been smuggled into the United States, was by law liable to be seized and forfeited to the government. From this fact, it has been suggested, that the following conclusions may be drawn. First. That by the 27th and 28th sections of the act of 1799, c. 128, the vessel was liable to forfeiture, by reason of being the recipient of smuggled goods, and therefore not capable of being insured. Second. That the cable, being liable to forfeiture, was not capable of being insured; and that being part of the ship, its infirmity infected the whole ship, and rendered it also incapable of insurance. Third. That as the cable was liable to be seized and removed, and the vessel to be detained, in consequence of such seizure, it was thereby exposed to an additional risk, either from the want of the cable, or the delay, which would discharge the insurers from any subsequent loss. Fourth. That the concealing the cable on board the Avon was an illegal act, by which the policy was avoided.

To the first point, without admitting the conclusion, it is sufficient to say, that the provisions contained in the 27th and 28th sections of the act do not apply to vessels, which have arrived at the usual places of loading and discharge. The Industry [Case No. 7,028].

To the second, that the liability of an article to be forfeited, does not render it incapable of being the subject of insurance, until it is seized. And the better opinion is, that, in cases of seizure, the forfeiture does not relate back to the time of the committal of the offence, but to the time of the seizure. When there is no seizure, the use, possession, and property remain in the owner, and constitute an insurable interest. The Mars [Id. 9,106]; U. S. v. The Anthony Mangin [Id.

14,461]; Id., 3 Cranch [7 U. S.] 356; Polleys v. Ocean Ins. Co., 13 Pet. [38 U. S.] 157; Lockyer v. Offley, 1 Term R. 260.

To the third, that no detention actually took place; that if the cable had been seized, detention was not necessarily a consequence; that the seaworthiness of the ship did not depend upon the ownership of the cables and anchors on board, but on their sufficiency in number and quality for the ship and voyage; that while actually on board, the ship could not be unseaworthy in that respect; and that the possibility of a detention, like an intention to deviate, could not have the effect of avoiding the policy.

To the fourth. The 60th section of the same act provides, that the concealing of goods liable to seizure, shall subject the offender to a penalty. But it does not enact, that the vessel or warehouse, in which the goods may be placed, shall be forfeited, or liable to any penalty.

If the position assumed be correct, then the commission of any offence against law, even a common assault, would avoid a policy on the vessel or house, in which it occurred. To avoid a policy on the ground of illegality, it must be shown, that the insurance is void, as against law, from matters appearing on the face of the policy, or that the insurance was intended to aid in effecting some illegal object. The former cannot be pretended. There is no illegality apparent on the face of the policy. Of the latter, there is no proof. The voyages, on which the ship was employed, were legal; the perils insured against were such as were legal risks; the parties to the contract contemplated nothing illegal when the policy was made. If at that time, the master expected to use a smuggled cable, he did not intend to smuggle it in this vessel; and the policy would not cover the cable, till the illegal act was consummated, and the cable became an appurtenance of the ship. There was no illegality in carrying a smuggled cable to sea, nor in using one. Armstrong v. Toler, 11 Wheat. [24 U. S.] 258; Polleys v. Ocean Ins. Co., 13 Pet. [38 U. S.] 157.

B. Rand, for defendants, argued in substance as follows:

By the act of 1799, c. 128, § 27, it is made unlawful to unlade any goods, imported from a foreign port, before the ship shall have come to the proper place for the discharge of her cargo or some part thereof, and shall be duly authorized to unlade the same; and in such case the goods are to be forfeited, which are thus unlawfully unladed. By the 28th section of the same act, it is made unlawful to put or receive any goods so unladen into any vessel, and the commander, and those who aid therein, forfeit thereby treble the value of the goods, and the ship, into which they are put, is thereby forfeited. By the 50th section of this act, no goods can lawfully be unladen between sunset and sunrise,

nor at any time without a permit therefor, and the commander of the ship, and others aiding therein, forfeit $400 each; the goods also are forfeited, and the ship, if, as in this case, the goods are over $400 in value. By the 68th section of the act, it is made unlawful to conceal goods, on which the duties are unpaid, in any ship or vessel, and the goods are forfeited thereby. And by the 69th section it is declared, that if any person shall buy or conceal any goods, knowing them to be liable to seizure, he shall forfeit double the amount thereof. The iron cable was forfeited, therefore, under the provisions of the 27th, 50th, or 68th sections of the act. The vessel, that is, the Avon, into which the iron cable was so unladen from the other vessel, without a license, was also forfeited by virtue of the 28th section. The putting, receiving, and concealing the iron cable on board the Avon were unlawful acts, by the 28th, 68th, or 69th sections. The defendants, therefore, insist, that the plaintiffs are not entitled to recover, because,—

1. The contract of insurance is illegal and void. Whether we regard the cable only, or the ship and cable, the policy covered property, which was dealt with illegally during the voyage, or during the time mentioned in the policy. It is quite immaterial, what part of the voyage, or time, the ship, or cable, which became a part of her, was so illegally dealt with, or for how long or short a space of time. If it were the last moment only of the voyage or time, it would be just as fatal to the policy, as if it were the first, or for the whole time. Story, Ag. p. 184, § 195, last paragraph; 3 Marsh. Ins. (3d. Eng. Ed.) 52; Wilson v. Marryat, 8 Durn. & E. [Term R.] 31; 1 Bos. & P. 430; Bird v. Appleton, 8 Durn. & E. [Term R.] 562; Bird v. Pigou, Selw. N. P. (8th Eng. Ed.) 994, note i.

It seems to be a general principle, established by decisions quite too numerous to admit of citation, that a contract immediately connected with, in aid of, or countenancing a violation of the law, such as a policy of insurance covering property, and intended by the owner to protect himself against loss in respect of it, while he is dealing with it contrary to the law, is utterly void. Policies upon goods afterwards, during some time in the course of the voyage or risk, smuggled into or out of the country, contrary to the provisions of the revenue laws, form only one class of cases, coming under the general rule. But they may well be referred to, as exemplifying the principle, on which all the decisions referred to seem to depend. 3 Marsh. Ins. (Eng. Ed.) 52. For other exemplifications, see Bensley v. Bignold, 5 Barn. & Ald. 335; Stephens v. Robinson, 2 Cromp. & J. 209; Bartlett v. Vinor, Carth. 251, approved in De Begnis v. Armistead, 10 Bing. 110, per Tindal, C. J. Inasmuch as the policy was intended to attach to the cable, without regarding the illegal use of the rest of the ship, it seems, that the whole policy is void. It was a valued policy. And the contract in this case certainly must be considered as indivisible. It is a much stronger case than many in the books. Parkin v. Dick, 11 East, 502, 2 Camp. 221; Camelo v. Britten, 4 Barn. & Ald. 184; 3 Marsh. Ins. 52 et seq.; Shiffner v. Gordon, 12 East, 294. But the whole ship was violating the law, whether we regard merely the 28th section of the act, or the general tenor and spirit of the revenue laws, while she was receiving on board and concealing the cable. This was clearly an unlawful use and employment of the ship. Not merely a part of the property covered by the policy, but the whole of it, was dealt with illegally during the risk, or voyage. The ship was aiding in a violation of the revenue laws, for the benefit solely of the owners. It is clearly immaterial in what form of words the act is rendered illegal, whether it be expressly forbidden, or the doing it be attended with a penalty or forfeiture, or however otherwise. 10 Bing. 110.

2. There was no insurable interest in the Avon at the time, when the loss happened. Both the ship and the cable were forfeited by the illegal transactions referred to. The property in them was so vested in the government, that the owners could afterwards have maintained no action for the ship, or any of her appurtenances. The owners could have made no valid transfer or abandonment of her to the insurance office; the forfeiture being declared by statute to take place immediately on the doing of the forbidden act. Gelston v. Hoyt, 12 Wheat. [25 U. S.] 311; McLane v. U. S., 6 Pet. [31 U. S.] 427; Fontaine v. Phoenix Ins. Co., 11 Johns. 293, also cited and approved 15 Johns. 25; U. S. v. 1,960 Bags of Coffee, 8 Cranch [12 U. S.] 404.

3. The policy is void by reason of the concealment of a material fact. The insured knew, when they smuggled the cable on board, that they should have, to say the least, no more than a defeasible title to the ship, including the cable; that they could almost give no other title to the wreck, to the insurance office, in case of shipwreck afterwards; and that the ship would be liable to be arrested, taken out of her course, detained, and deprived of her cable, if nothing worse. These, especially in the case of a valued policy, were matters material for the defendants to know. Parkin v. Dick, 11 East, 502.

4. The vessel was unseaworthy. It is admitted, that, without the iron cable, she would be unseaworthy. But the title to the iron cable, as we have seen, was vested in the government from the moment it was put on board, and dealt with contrary to law. It was liable to be taken at any moment. It did not belong to the owners of the ship, and could not be considered, under the circumstances, as making a part of her for the purpose of rendering her seaworthy. Nor can

the plaintiffs be permitted to show and insist upon this illegal transaction as rendering their ship seaworthy. It is to be remembered, that the hempen cable, which the Avon had on board, when she sailed from Waldoborough, was not intended to be kept on board but for a short time, and until the iron cable should be substituted. It was not intended to, and did not render her seaworthy for the whole voyage, or the whole time of the risk, or insurance. Unless the iron cable can be taken into view for this purpose, she was, therefore, unseaworthy.

STORY, Circuit Justice. The present policy was underwritten for all the owners upon their joint account; and under such circumstances I agree, that if the policy at its inception, was founded in any illegality (in which one only of the owners (the master,) who is said to be the owner of one eighth, participated, it is utterly void as to all; for the policy is not divisible, so as to be good in part, and bad in part. It must then stand in toto, or not at all. The case of Parkin v. Dick, 2 Camp. 221, is not exactly like the present; but it may serve to illustrate the principle. The policy here is a joint contract for all the owners; and no recovery can be had, unless it is legal as to all of them; for whatever is recovered must go for the joint account. If all the plaintiffs had sued on the policy in their own names, we should see at once, that the objection would be fatal. It can make no difference, that the suit is brought in the name of their agents; for if the principals could not recover, by reason of any illegality, their agents cannot. In Parkin v. Dick, 2 Camp. 221, the policy was on different articles, each package of which was to pay the same average, as if it were separately insured; and some of the articles specified on the back of the policy were naval stores, the exportation of which was prohibited, without a license from the crown. No such leave was obtained for the voyage; and Lord Ellenborough first, and afterwards the court of king's bench, held the policy utterly void, as to all the other articles insured, as well as the naval stores. Lord Ellenborough, in delivering the judgment in the court of king's bench (11 East, 502, 503), said: "The policy is one entire contract on goods to be thereafter specified, to which the underwriters subscribed; and the subsequent specification, by the assured, cannot alter the nature of the contract with respect to the underwriters, so as to sever that, which was originally one entire contract. It has been decided a hundred times, that if a party insure goods altogether in one policy, and some of them are of a nature to make the voyage illegal, the whole contract is illegal and void." Now, this language applies, a fortiori, to a joint contract, where one party, by reason of his own illegality, is incapable of recovering See, also, De Begnis v. Armistead, 10 Bing. 107, 110, 111.

But the main questions in the present case are, first, whether there is any illegality in the transactions, which affected or could affect the owners personally, or could justify proceedings in rem against the vessel insured; and secondly, if there was, whether that illegality was of a nature, which affected or could affect the present policy, or the voyages thereby insured. In respect to the first question, the material facts are, that before the ship sailed from Waldoborough, the master being, as before stated, a part owner, was employed by the other owners to procure the rigging and a part of the equipments of the ship. The master employed his brother, who was about to sail for Pictou in Nova Scotia, to procure there a chain cable for the ship, which was afterwards intended to be brought into the United States, and placed on board of the ship (as I think the subsequent circumstances show) without the payment of duties upon the importation thereof. The chain cable was accordingly bought and shipped on board of an American vessel, concealed under her cargo. The vessel afterwards arrived at New York without the cable's being entered or landed there; and the cable was thence carried in the same vessel to New Orleans, where it was secretly and without any license, and without the payment of any duties, put on board of the Avon, then lying in that port, and kept concealed on board until her departure from the port, on the voyage for Liverpool, during which she was lost. The statement of facts further admits, that there is no evidence, that any of the owners, except the master, were privy to, or had any knowledge of these doings, or of the master's intention.

The question, then, is, whether the taking on board of this chain cable, at New Orleans, under the above circumstances, was an illegal act, for which the owners were immediately liable by a suit in personam, or the vessel herself was subject to forfeiture. The argument for the insurance company is, that the transaction was within the provisions of the 27th and 28th sections of the duty collection act of 1799, c. 128, and also against the provisions of the 50th and 69th sections of the same act. It seems to me, that the twenty-seventh and twenty-eighth sections of the act may at once be laid out of the case. The former applies only to vessels, which unlade a part of their cargo within the limits of some district of the United States, or within four leagues of the coast thereof, and before such ship or vessel shall have come to the proper place for the discharge thereof. The 28th section applies only to the vessel, which shall have received the same goods so unladen. So that it is apparent, that the forfeitures and penalties do not cover a case, like the present, where the cable was unladen after the arrival of the vessel at her proper port of discharge, and there taken on board of the Avon. This construction has nothing new in it. It was many years ago adopted

by this court in the case of The Industry [Case No. 7,028].

The 50th section of the act is, however, directly in point. It prohibits the unlading of any goods brought in any vessel from a foreign place, without a special license or permit of the collector, or other proper officer of the customs; and if they are unladen without such a license or permit, and are of the value of four hundred dollars, the vessel, from which they are unladen, is forfeited. But this forfeiture attaches only to the unlading vessel, and not to the receiving vessel. The Industry [supra]. So that under this section of the act the Avon was not subject to any forfeiture. But there is a clause in the same section, which imposes a pecuniary penalty of four hundred dollars upon the master, and any other persons, who shall knowingly be concerned or aiding in such unlading, or in removing, storing, or otherwise securing the goods. The master of the Avon was clearly within the reach of this prohibition and penalty; for he was knowingly concerned in the unlawful unlading of the iron cable. The sixty-ninth section of the same act, also, seems to me clearly to cover the present case, and to inflict a pecuniary penalty on the master of the Avon. It provides, that if any person shall conceal, or buy any goods, knowing them to be liable to seizure under the act, he shall forfeit and pay a sum double the amount in value of the goods so concealed or purchased. The state of facts shows a most studied concealment of the iron cable by the master of the Avon, and, therefore, brings him clearly within the reach of the penalty.. But then, there is no forfeiture inflicted upon the vessel, or other vehicle, or the store, in which the concealment takes place.

The result, therefore, is, that in the present case the Avon was not subjected to any forfeiture whatsoever in rem; but the act of smuggling and concealing the iron cable was illegal, and the master of the Avon was concerned in such smuggling and concealment, and personally liable to the pecuniary penalties prescribed therefor. I adopt the doctrine of Lord Holt, in Bartlett v. Vinor, Carth. 252, and of Lord Chief Justice Tindal, in De Begnis v. Armistead, 10 Bing. 107–110, that every contract made for, or about a matter or thing, which is prohibited, and made unlawful by statute, is a void contract, although the statute does not mention that it shall be so, but only inflicts a penalty on the offender; because a penalty implies a prohibition, although there are no prohibitory words in the statute. In other words, every statute, imposing a penalty, imports a prohibition, and makes the prohibited act illegal.

So that, in this view, we are driven to the consideration of the other question in the case; and that is, whether this illegality was of a nature, which affected, or could affect the present policy, or the voyage or voyages thereby insured. Now, it is material to state,

that the question is not, whether, if a seizure of the ship had taken place, on account of this illegal conduct of the master, the underwriters would have been liable for any loss or injury consequent thereon, or whether, if the iron cable had been seized and confiscated by a regular sentence of condemnation for the illegal unlading thereof, the underwriters would have been liable for such a loss, as an appurtenance of the ship. There is no doubt whatsoever, that in neither case would the underwriters have been liable on the policy; for the proximate cause of the loss would have been the illegal or fraudulent act of the master, from which, under our policies, the underwriters are ordinarily exempted. The present loss was by the peril of the sea,—a peril clearly insured against; and if we are to regard the maxim, "Causa proxima, non remota, spectatur," the plaintiffs are entitled to recover for that loss, unless the policy itself, or the voyage was illegal.

I confess myself wholly unable to perceive upon what ground the policy itself is void, or the voyage, during which this transaction took place, is illegal. The policy was on time, for the term of one year; and, of course, covered all legal voyages, which might be undertaken during that period. At the time, when it was underwritten, there is no pretence to say, that it was in the contemplation of the insured to engage in any illegal voyages whatsoever. The voyage from Waldoborough to New Orleans, and from thence to Liverpool, was in all its objects and ends perfectly legal. The only possible suggestion, which, upon the state of the facts, can be made, is, that the master about that period contemplated the procurement of a chain cable for the ship from the British provinces, which might at a subsequent period be illegally taken on board at another port, and which was in fact taken on board, long after the policy was underwritten and had attached upon a voyage then in progress. Now, I am unable to see, how the validity of a policy can be affected by a mere contingent future contemplated illegal act in the progress of a voyage, the voyage itself being otherwise in its origin, concoction, and accomplishment perfectly legal. Suppose, in the present case, the chain cable never had been carried to New Orleans, or taken on board the Avon, it would certainly be difficult for a moment to maintain the doctrine, that the policy was utterly void. A mere intention to do an illegal act, or other act, which would avoid a policy, if done, but which has never been consummated by any act, has never, as far as I know, been deemed per se to vitiate the policy. There is in all cases of this sort a locus poenitentiae; there must be the act and the intent coupled together. If, when a policy on a ship is underwritten, the owner has in contemplation a deviation from the voyage insured, but, from a change of purpose

or otherwise, no deviation in fact takes place, we all know, that the policy is good, and covers all losses insured against. Put the case much stronger, and indeed one, which reaches in its scope the present; suppose, at the time when a policy on the ship is underwritten on a voyage perfectly lawful, out and home, the owner has it in contemplation to smuggle a part, or even the whole of the cargo on the return voyage, but it is a mere contingent intention, and not absolute; and, in point of fact, he afterwards in the course of the voyage changes his intention, or, without changing his intention, no smuggling ever takes place; would the policy be utterly void in its concoction, so as not to cover any losses occurring in the course of the voyage by the perils of the sea? I know no case, that goes to such an extent. In order to produce such an effect, as to make the policy utterly void in its origin, it is necessary, that the plan of the voyage itself, and the main purposes of the enterprise should be absolutely illegal. The voyage should be originally and absolutely, in whole or in part, illegal, as to trade and objects; such as a voyage to and from an enemy's port, or a voyage for the purpose of smuggling goods out and home; or a voyage in the violation of some other public law, such as the breach of an embargo or non-intercourse edict (see 1 Phil. Ins., 2d Ed., 1840, pp. 85, 91, 92); and not merely a contingent intention to do some collateral act in the course of a legal voyage or trade, which might itself, if done, be illegal. The illegality should not only be contingently contemplated; but there should be some overt act put in progress, as by sailing in furtherance and accomplishment of the illegal voyage.

The case of Parkin v. Dick, 2 Camp. 222, 11 East, 502, 503, was a case, where the insurance was on goods, a part of which were by law prohibited from exportation; it was held, that the voyage, as to such goods, was illegal in its origin; and that, therefore, the whole policy was void. The queston in Wilson v. Marryat, 8 Term R. 31, 1 Bos. & P. 430, was, whether a policy on a circuitous voyage from America to the East Indies was prohibited by the British laws. It was held, that such a circuitous voyage was not so prohibited; and consequently the policy was valid; but otherwise it would have been void. In Bird v. Pigou (see 2 Selw. N. P., London Ed., 1831, p. 991; Id., Wheat. Ed., p. 191, note; 1 Phil. Ins., 2d Ed., 1840, p. 91) Lord Kenyon held, that if any part of an integral voyage be illegal, a policy upon the integral voyage is void. I see no reason to doubt the correctness of this decision. It seems founded in a plain principle of law, that a contract is an entirety, and cannot be good in part and bad in part. It is true, that Lord Kenyon is reported in Wilson v. Marryat, 8 Term R. 31–46, to have gone further, and to have said, that if there were any

infirmity or illegality in any part of the integral voyage, it would have made the whole voyage illegal, so that the assured could not recover on a policy on any part of it, even a policy on that part alone, which was legal. This was a mere obiter dictum, not called for by the case; and it is certainly somewhat shaken, although not overturned, by the decision in Bird v. Appleton, 8 Term R. 562. On that occasion Mr. Justice Lawrence said; "In order to render the insurance illegal, the illegality should exist during the course of the voyage insured." It will be found exceedingly difficult, in point of principle, to distinguish between an illegality in a former voyage, and that in a prior part of a sound voyage, where the policy covers only the part of the voyage, which is legal.

There are, moreover, other cases (on which I shall presently have occasion to comment), in which a doctrine has been asserted, which is perhaps not easily reconcilable with that in Parkin v. Dick, unless upon the ground, that the policy in that case was made upon the illegal goods, as a part of the specification on the policy. But, certainly, these cases go far to invalidate the broadness of the argument, which has been addressed to the court upon the present occasion. That argument goes to this extent, that if the policy covered any property, which was dealt with illegally during the voyage or time mentioned in the policy, it avoided the policy. It would hence follow, that if a ship was insured upon a lawful voyage, and afterwards, during the course of the voyage, she should be engaged in any transaction, which was illegal, and a fortiori, if she should be engaged in a transaction, which would subject her to seizure, and she should afterwards be lost by a mere peril of the seas (no seizure having been made), no recovery could be had for the loss. Now, I am not ready to accede to that proposition. On the contrary, as I understand the law, although the underwriters would not be liable for a loss by such a seizure; yet a loss occasioned by any other peril would be recoverable; because the policy itself would originally be valid at its inception, and the voyage would be lawful, when the risk attached. I agree, that if there was an illegality attaching to a part of the voyage insured at the commencement of the risk under the policy, it would avoid the policy. So it was held, in regard to the insurance on the ship in Bird v. Appleton, 8 Term R. 563, 566. But in that very case, there was another policy on goods; and the objection taken was, that the insured could not recover on the policy on goods belonging to the owner of the ship, because the ship was liable to seizure on account of an illicit traffic in the anterior part of the voyage. Mr. Justice Lawrence, on that occasion, said, that he did not think the objection well founded. "Here (said he) the illegality commenced by the captain's taking

on board a cargo at Bombay in order to carry it to Canton for sale (the insurance being on a cargo at and from Canton). But the doctrine relied upon by the defendant is perfectly new, that the insured cannot recover on a policy against the underwriters, because the ship, on a prior voyage, had been guilty of some transgression, for which she was liable to seizure. That is not a risk within the policy. If the ship had been seized for this cause during the voyage, the underwriters would not have been liable. They are only liable for risks in the course of the voyage insured." The same doctrine was held by Mr. Justice Le Blanc, in the same case. So that we see, that past illegality in the voyage will not affect a policy, which is otherwise legal. Neither should a future contingent illegality. There must be a present, actual illegality attaching to the very policy, at the commencement of, and as a part of, the risk.

But, then, it may be said, that here the illegal intent was completely carried into effect at New Orleans; and, therefore, there is both act and intent; and then the policy is utterly void ab initio. But we must take the present case according to the truth of the whole circumstances. The first question is, whether the policy ever attached as a valid contract to the ship. If it did, then the question is shifted. It is no longer, whether the policy had any original validity; but whether an intended subsequent illegal act, consummated long after it attached to the ship, in the progress of a lawful voyage, would avoid it ab initio, or only exempt the underwriters from any losses occasioned by that illegal act.

Now, it is here, that the cases, to which I have already alluded, may be deemed to apply. They in effect decide, that if the voyage, as originally insured, was valid, any subsequent illegality in the course of the voyage will not affect the policy, so far as concerns losses on property, not tainted by such illegality, although connected with the res gestae. In Butler v. Allnutt, 1 Starkie, 222, the policy was on a cargo, on a voyage from an enemy's port, with a clause for a return premium of 4 per cent. on the safe arrival of the vessel in London from Bordeaux, the enemy's port. The voyage was undertaken under a license from the crown; but it was for the importation of certain specific articles; and others were taken on board, not included in the license. The suit was brought for the return premium, the vessel having safely arrived; and one objection taken was, that the articles taken on board, and not included in the license, vitiated the whole license and policy. But Lord Ellenborough held, that under the license the voyage was lawful, and although the ship took on board other articles, that only removed the protection pro tanto. The same point was held in Keir v. Andrade, 6 Taunt. 498, which was the case of a policy on goods at and from London to

Madeira, valued at £1,000, to pay average on each package. The goods were 300 barrels of gunpowder, of which the exportation of 150 barrels only was authorized by a license from the crown; and the plaintiff claimed for a loss by capture. One objection taken was, that the exportation of the second 150 barrels was prohibited, and by statute the same barrels, as well as the ship, were thereby forfeited; and that, therefore, the whole adventure was illegal, and the insurance also illegal for the whole. But the court held, that the policy was valid, and covered the 150 barrels, the exportation of which was lawful, but not the other 150 barrels. Now, here, we see, that there was not only an original intention to make an illegal exportation of the second 150 barrels, but that it was carried into effect by an actual exportation; so that there was intent and act. But the court thought, that as the voyage was, under the license, in itself legal, the illegal exportation of a part of the property insured, did not affect that, which was within the license. See, also, Camelo v. Britten, 4 Barn. & Ald. 184. This is certainly a very strong case, since it may well be presumed, that the whole enterprise, in its origin and concoction, was for the whole 300 barrels; and the policy was made to cover the whole; and the voyage was commenced and prosecuted with the same intent. The case of Sewell v. Royal Exchange Assur. Co., 4 Taunt. 856, approaches very near to the present. In that case there were two policies of insurance, one on the ship, and another on the ship and freight; the first on a voyage at and from Ramsgate (England) to St. Michaels; the second on a voyage at and from St. Michaels to London. The ship was Norwegian built, and owned in Denmark, then hostile to England, and was purchased by the plaintiffs under a license from the king. The ship was chartered by the master, as agent for the plaintiffs, to the freighter of the cargo, for a voyage from London to St. Michaels, and there to take on board a full cargo of fruit, and bring the same to London. The vessel was seized at St. Michaels, and carried to Tercera, and there sequestered. The loss was averred to be by a public seizure and capture. At the trial, one objection taken was, that, under the British navigation act, an importation in the vessel of such a cargo was prohibited; and that, since the charter party was for the entire voyage out and home, the illegality vitiated, as well the policy on the outward voyage as that upon the homeward voyage. The jury found a verdict for the plaintiffs upon the policy on the outward voyage; and this verdict was afterwards confirmed by the court. On this occasion, Sir James Mansfield, in delivering the opinion of the court, stated the ground of the decision to be, that it did not necessarily follow, that the master might not have obtained a license for the importation from the crown, which was authorized to

grant one, before the actual importation; and therefore the homeward voyage was not necessarily illegal. But the court intimated very strongly, that if the homeward voyage had been illegal, the outward voyage being legal, there was a locus poenitentiae for the party not to perform the latter,. and therefore a recovery might be had on the policy on the outward voyage. The language of Sir James Mansfield was: "Much of the argument was, ·that this was an illegal voyage. not only in the contemplation of the master; but that he was bound by the charter party, which he had entered into, to pursue it at all events. It is not necessary now to decide, what would be the consequence of a person entering into a charter party for a voyage out and home. the voyage home being illegal, and of his separating it into two voyages, by insuring the outward voyage separately, and the homeward voyage separately. The court are not called upon to decide, whether in that case the outward voyage is part of the homeward and illegal voyage. If there were a clear locus poenitentiae, it would be unnecessary to decide, that the outward voyage was illegal; for if the captain, getting out thither, discovered, that he was on an illegal charter party, and that he could not enforce the payment of his freight, he might go off to any other part of the world." Now, this language is applied to a case far more stringent, than that now before this court. There, the original voyage, out and home, was absolutely fixed and in progress under the charter party. Here, the whole voyage contemplated by the policy was legal; and there was only a contingent future act of illegality contemplated to be done by the master, and which might never be done. There was not only a locus poenitentiae, but there was a contingency as to the future purchase and arrival of the chain cable.

The case of the Ocean Ins. Co. v. Polleys, 13 Pet. [38 U. S.] 157, 163, 164, clearly shows, that although a vessel insured has been previously guilty of an illegality, which subjects her to forfeiture, that circumstance will not affect any contracts touching her future employment in a legal trade, or on a legal voyage, or a policy on her for such a voyage. Nay, as was said in Bird v. Appleton, 8 Term R. 562, 569, 570, the antecedent character of the property insured or the title, by which it has been obtained, whether illegal or not, makes no difference. It still may be insured on a legal voyage. Suppose goods, smuggled on a former voyage, were afterwards embarked on a new, and lawful voyage, never having been seized, it seems clear, that they would be insurable. The contract is one degree removed from the illegality. See Armstrong v. Toler, 11 Wheat. [24 U. S.] 258.

We have seen, according to the reasoning and authorities already stated, that, where the voyage is legal, a future contemplated illegality in the course of that voyage does not make it void ab initio. Then does it make any difference. that the future illegal act is consummated, if the act does not contaminate the voyage itself? I think not. If the illegal act is followed by a forfeiture and seizure of the thing insured, I agree, that the underwriters are not liable for the loss. But the mere fact of liability to forfeiture does not avoid the insurance, or prevent a recovery for a loss by any independent peril. The fact is, that a ship or other property does not lose its insurable character by being liable to seizure and forfeiture for an antecedent act or for a subsequent act, by which she is by law forfeitable. Until seized, and forfeited, the owner retains his original ownership thereof. . Here, as has been already suggested, the voyage from New Orleans to Liverpool was a legal voyage; the taking on board the chain cable there was a collateral act, illegal, indeed, but no more touching the legality of the voyage, than if there had been taken on board some illegal ship-stores, or smuggled wines for the voyage. It would be an alarming doctrine, if once established, that any collateral act of illegality in the course of a voyage, not an original practical ingredient in the voyage itself, should avoid a policy ab initio. A single bale of goods, smuggled by the master or owner of the ·cargo, in the course of the voyage, might, under such circumstances, defeat the whole insurance upon the ship and cargo, or both, although there was no illegality otherwise directly attaching to them. When the chain cable was taken ·on board at New Orleans the act of illegality was complete, and ended. It had nothing to do with the further prosecution of the voyages of the ship for the remaining term of time, covered by the policy. Suppose the chain cable had been smuggled on a former voyage by the owners, and put on board at Waldoborough or New Orleans, would that illegality have infected the subsequent voyage of the ship, while it remained on board? Suppose a ship's sails are made of smuggled canvass, illegally smuggled into the country, will that avoid an insurance on her on any subsequent voyages? Certainly, upon authority and principle, not.

But, then, it is suggested, that the insurance, as to the chain cable itself, is void at all events. It seems to me not, upon the ground, that the title was in the owner, and the illegality did not attach to the voyage, on which it was used. It is like an insurance on goods already smuggled. The chain cable did not become an appurtenance of the ship, until taken on board and concealed. The act of illegality was then, as has been already suggested, consummated before it attached to the ship as a part of her equipment. The time, when the antecedent liability to forfeiture took place, under such circumstances, is of no consequence, whether it be a day, or a year.

Again, it is suggested, that here the policy is void ab initio by reason of the concealment from the underwriters of the original inten-

tion to smuggle this chain cable on board of the ship during the voyages and term of time insured. Reliance seems to be placed for this suggestion upon an obiter dictum of Mr. Justice Bayley, in Parkin v. Dick, 11 East, 504, where he said, that the ship being liable to seizure in consequence of having the naval stores on board, was thereby subjected to an extra risk, which ought, therefore, to have been communicated to the underwriters; and the omission of such communication would alone have avoided the policy. I meddle not with that proposition, with reference to circumstances, like those in Parkin v. Dick, although it is open to much observation. It is sufficient to say, that in that case the insurance was directly in part on property exported for an illegal voyage. Here there was in contemplation only a contingent future act of illegality. Has it ever been held, that the nondisclosure of a contingent intention of future deviation, or even a present positive intention of future deviation from the voyage by the insured, was such a concealment, as would avoid a policy? Certainly, such a doctrine could hardly be maintainable. Again, it is suggested, that the ship and chain cable were both forfeited to the government, and vested eo instanti in the government by operation of law, as soon as it was taken on board; and consequently the owners had nothing to abandon to the underwriters; and at all events, the chain cable was forfeited, so that it was no lawful appurtenance of the ship, and she was not seaworthy for the voyage. The argument, so far as concerns the ship, has been already answered, by showing, that she was not liable to forfeiture. But if the case were otherwise, the argument is founded on a fallacy. It is not correct to say, that property forfeited is vested in the government at the very moment of forfeiture, and the title of the owner immediately devested. On the contrary, the established doctrine is, that, notwithstanding the forfeiture, the property remains in the owner, until it is actually seized by the government, and then by the seizure the title of the government relates back to the time of the forfeiture. In the case of U. S. v. 1,960 Bags of Coffee, 8 Cranch [12 U. S.] 404, and Gelston v. Hoyt, 3 Wheat. [16 U. S.] 247, 311, there had been a seizure and prosecution for the forfeiture by the government. The case of The Mars [Case No. 9,106], in this court, as to this point, has never, to my knowledge, been doubted or denied. The case of Lockyer v. Offley, 1 Term R. 252, 260, manifestly proceeded upon the ground, that until seizure the property of the owner was not devested. Mr. Justice Willes, in delivering the opinion of the court in that case, said; "But it has been said, that under St. 24 Geo. III. c. 47, and the excise laws, the forfeiture attaches, the moment the act is done; and that the barratry (smuggling) was committed during the voyage. It may be so for some purposes, as to prevent

intermediate alienations and incumbrances. But I think the actual property is not altered, till after the seizure, though it may be before condemnation." The same doctrine was taken for granted by the supreme court in Ocean Ins. Co. v. Polleys, 13 Pet. [38 U. S.] 157. I am aware of the bearing of the cases of Fontaine v. Phoenix Ins. Co., 11 Johns. 293, and also of the incidental confirmation of the doctrine thereof, in Amory v. McGregor, 15 Johns. 24. But I am not prepared to accede to the doctrine there stated, opposed, as it is, to the other authorities and doctrines already stated. In short, I have been long accustomed to lay it up as an elementary axiom that, in all cases of forfeiture of personal chattels, the property of the owner is not devested, until there is an actual seizure thereof by or for the use of the government. This view of the matter disposes of this part of the argument in both of its branches, viz. as to the abandonment, and as to the seaworthiness of the ship.

Upon the whole, my judgment is, that the plaintiff is entitled to recover for a total loss on the policy.